**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **WILLIAM CURRY & REGINALD MCFARLAND,** ) | **CIVIL ACTION FILE NO.:** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **JUDSON HILL,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |
| ) | |
| ) | |

## COMPLAINT FOR DAMAGES

COMES NOW, PLAINTIFFS WILLIAM CURRY, ("Plaintiff Curry"), AND REGINALD MCFARLAND ("Plaintiff McFarland") (jointly "Plaintiffs") by and through undersigned counsel, and files this Complaint for Damages against the above-named Defendant for Negligent Misrepresentation, Fraud, violations of the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-1 et seq., violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq., violations of the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390 et seq., attorneys' fees and expenses of litigation pursuant to

1

O.C.G.A. § 13-6-11, and punitive damages, and in support hereof shows this Court the following:

## INTRODUCTORY FACTS

1.     This case arises from Defendant's coordinated creation, marketing, promotion, sale, and management of syndicated conservation easement tax shelter transactions for tax year 2017, along with other 3rd parties

2.     Defendant on December 19, 2017 in conjunction with other 3rd parties promoted the transactions as legitimate real estate investments with lawful, defensible conservation easement deductions, while concealing that the transactions were structured and operated to generate grossly inflated tax deductions through sham real estate options and predetermined valuation outcomes.

3.     Plaintiffs were introduced to the transactions through the same promoter network used to solicit other potential investors. The promoter group included Judson Hill who would direct potential victims to Sean O'Toole and Jack Fisher, collectively referred to herein as the "Promoters."

4.     In 2017, Mr. Judson Hill ("Defendant Hill" or "Defendant") had a pre-existing contractual business relationship with Telrite Corporation where Plaintiffs were employees and officers of Telrite Corporation.

5. On December 19, 2017 Defendant initially solicited Plaintiffs regarding the syndicated conservation easement transactions (the "Fraudulent CE Scheme") for tax year 2017 while providing contractual consulting services to Telrite Corporation.

6. On December 19, 2017 Defendant communicated verbally using a cellphone, and also in writing via text message and email to Defendant Curry and Defendant McFarland that the Fraudulent CE Scheme was a legitimate tax strategy used to lower taxable income based on conservation easement donations which provided a valid charitable deduction for investors to reduce their tax burden.

7. The investment structures were then implemented, managed, documented, and/or administered through 1908RCGC17 LLC, Illuminate Resources Group LLC, Coastal Property Holdings LLC, Bayou Sand Imvestors LLC, and Coastal Community Partners LLC, collectively referred to herein as the " "Managers and Managing Entities."

8. Defendant, the Promoters, and Managers and Managing Entities operated as co-conspirators in a coordinated enterprise to market and implement syndicated conservation easement transactions designed to generate substantial tax deductions which Defendant, the Promoters, and Managers & Managing Entities

knew would not be fully allowed under the regulations of the Internal Revenue Service (IRS).

9.    The Defendant, along with the Promotors, Managers and Managing entities, used interstate wires, emails, telephone communications, offering memoranda, valuation summaries, subscription documents, tax matrices, appraisal-related communications, investor portal materials, U.S. Mail, and private carriers to market the transactions, transmit the documents needed to close the investments, accept investor funds, and later suppress inquiry regarding the true nature of the transactions.

10.    The Defendant was paid a commission by the Promoters and Managers & Managing Entities for every potential victim that invested in the Fraudulent CE Scheme.

11.    Defendant was paid a commission by the Promoters and Managers & Managing Entities as compensation for Plaintiff McFarland's investment. Defendant was paid a commission by the Promoters and Managers & Managing Entities as compensation for Plaintiff Curry's investment.

12.    Defendant was also an employee of 1908 Capital and its affiliated entities, including 1908RGC17 LLC, 1908 Capital RGC LLC, and 1908 Capital

CCP LLC (collectively, "1908"), and acted within the course and scope of that employment when he solicited Plaintiffs and promoted the Fraudulent CE Scheme.

13. Defendant's scheme depended on the same core misrepresentations: that the investments were lawful real estate opportunities; that the properties had multiple viable development, mining, holding, or conservation options; that the conservation easement path was only one of several bona fide alternatives; that the resulting deductions were supported by credible valuations and qualified appraisals; and that the transactions were defensible despite known IRS scrutiny of high-multiple syndicated conservation easements.

14. In truth, the purported non-tax alternatives were not viable, were not intended to be pursued, and were included solely to create the appearance of economic substance and business purpose while the real purpose of the transactions was to generate inflated charitable contribution deductions.

15. Defendant's conduct injured Plaintiff's business and property, including loss of investment capital, tax-related liabilities, assessments, interest, penalties, professional fees, attorneys' fees, accounting fees, and other costs incurred because of IRS and/or state taxing authority review and disallowance of the claimed deductions.

16.    Plaintiff Curry's damages exceed $387,075.00 and Plaintiff McFarland's damages exceed $3,102,076.00 and arise specifically from the IRS's disallowance of charitable deductions claimed for the 2017 tax year arising from the syndicated conservation easement transactions promoted, managed, and implemented by Defendant.

17.    Defendant's conduct was willful, knowing, wanton, and in conscious disregard of Plaintiff's rights, and must be punished.

## I.    PARTIES, JURISDICTION, AND VENUE

18.    Plaintiff William Curry is an individual and taxpayer who, at all times relevant, invested in one or more syndicated conservation easement transactions promoted, marketed, managed, and/or administered by Defendant for tax year 2017.

19.    Plaintiff Reginald McFarland is an individual and taxpayer who, at all times relevant, invested in one or more syndicated conservation easement transactions promoted, marketed, managed, and/or administered by Defendant for tax year 2017.

20.    Defendant Judson Hill (sometimes referred to as "Mr. Hill"), is an individual who, upon information and belief, resides in Georgia and acted as a promoter, solicitor, referral source, and participant in the syndicated conservation

easement RICO Enterprise at issue. He may be served at 3102 Raines Court, Marietta, Georgia 30062, or P.O. Box 2141, Blairsville, Georgia 30512.

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims arising under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.

22. This Court has supplemental jurisdiction over Plaintiffs' related Georgia law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy.

23. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

24. This Court has personal jurisdiction over Defendant because Defendant resides in Georgia, transacted business in Georgia in the Northern District of Georgia, directed tortious conduct through Georgia-based entities and Georgia-based investment structures, participated in a Georgia-centered investment and tax shelter enterprise, used Georgia-based persons and entities to promote and manage the transactions, and caused injury to Plaintiff.

25. Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this District, because Defendant transacted business in this

District, and because Defendant resides in and is subject to personal jurisdiction in this District.

26. Plaintiffs reserve the right to amend this Complaint to add additional parties, correct service addresses, identify unknown participants, and incorporate additional facts discovered through investigation and discovery.

## II. STATEMENT OF FACTS

### A. **Defendant Participated in and Promoted Multiple Fraudulent Conservation Easement Schemes.**

27. Defendant jointly and in concert with the Promoters, Managers & Managing Entities, created, promoted, marketed, sold, managed, and implemented syndicated conservation easement transactions to Plaintiffs for tax year 2017 starting on December 19, 2017.

28. Defendant promoted these transactions as legitimate real estate investments with substantial potential business purposes, including mining, real estate development, holding property for investment, and conservation.

29. In truth, the transactions were knowingly and intentionally structured as illegal and abusive tax shelter schemes premised on grossly overinflated syndicated conservation easement deductions.

30. Defendant used investor summaries, tax matrices, subscription documents, offering materials, appraisal-related materials, highest-and-best-use materials, tax memoranda, investor portal instructions, emails, and investor correspondence to market and implement the transactions.

31. Defendant did not present the transactions as isolated investments. Instead, Defendant used substantially similar structures across multiple investment entities, with the same general model: identify property, promote supposed mining, development, holding, or conservation options, present conservation as one option, and then use that conservation option to generate large tax deductions for investors.

32. Defendant also instructed investors to use 1908 Capital's website and investor portal to access investor information, click the RGC fund, click "Invest Now," and wire funds into escrow.

33. Plaintiff Curry executed subscription documents for 1908RGC17 LLC on December 26, 2017.

34. Plaintiff Curry paid to 1908RGC17 LLC $90,000.00 with the promise of a charitable deduction four time greater than his initial investment via a conservation easement donation.

35. Sean O'Toole accepted Plaintiff Curry's subscription on behalf of 1908RGC17 LLC and 1908 Capital RGC LLC as Manager.

36.    Plaintiff McFarland paid $1,025.797 to Illuminate Resources Group LLC, Coastal Property Holdings LLC, Bayou Sand Investors LLC, and Coastal Community Partners LLC with the promise of a charitable deduction four time greater than his initial investments

37.    Sean O'Toole and Jack Fisher accepted Plaintiff McFarlands's subscription on behalf of Illuminate Resources Group LLC, Coastal Property Holdings LLC, Bayou Sand Investors LLC, and Coastal Community Partners LLC as Managers.

## B. Defendant Solicited Plaintiff and Misrepresented the Transactions

38.    Mr. Judson Hill ("Mr. Hill" or "Defendant Hill") had a pre-existing contractual business relationship with Telrite Corporation or Telrite Holdings, Inc.

39.    Defendant Hill initially solicited Plaintiff regarding the syndicated conservation easement transactions for tax year 2017 while providing contractual consulting services.

40.    At all times relevant to this Complaint, Defendant was an employee of 1908. Defendant's duties as an employee of 1908 included the solicitation of prospective investors, the promotion and marketing of the transactions comprising

the Fraudulent CE Scheme, and the referral of prospective investors to Mr. O'Toole and Mr. Fisher.

41.    Defendant's name, likeness, photograph, biography, professional credentials, public standing, and reputation were used in the marketing, promotion, and sale of the Fraudulent CE Scheme to Plaintiffs and to other prospective investors.

42.    Defendant's name, likeness, and endorsement were used as a primary marketing tactic by 1908 and by each of the entities with which Plaintiffs executed contracts and subscription documents, including 1908RGC17 LLC, Illuminate Resources Group LLC, Coastal Property Holdings LLC, Bayou Sand Investors LLC, and Coastal Community Partners LLC.

43.    Defendant knew of, consented to, participated in, directed, and profited from the use of his name, likeness, and endorsement in the marketing, promotion, and sale of the Fraudulent CE Scheme.

44.    The use of Defendant's name, likeness, and endorsement was intended to, and did, convey to Plaintiffs and to other prospective investors that the transactions had been examined and approved by a person of standing, integrity, and independent judgment, and that the transactions and the resulting charitable contribution deductions were lawful, legitimate, and defensible.

45. The use of Defendant's name, likeness, and endorsement served to lull Plaintiffs and other prospective investors into a false sense of security and legitimacy, and thereby to discourage independent investigation, independent due diligence, and consultation with independent tax counsel regarding the transactions.

46. The lulling effect of Defendant's name, likeness, and endorsement continued after Plaintiffs' investments closed, and further delayed and deterred Plaintiffs from discovering the true nature of the transactions and from bringing claims earlier.

47. Plaintiffs relied upon Defendant's name, endorsement, apparent independence, and apparent affiliation with 1908 in deciding to invest in the Fraudulent CE Scheme, and would not have invested had Defendant's name and endorsement not been attached to the transactions.

48. By reason of his employment with 1908, his solicitation of prospective investors, his receipt of commissions from the Promoters and the Managers & Managing Entities, and the use of his name, likeness, and endorsement as a primary marketing tactic for the Fraudulent CE Scheme, Defendant participated in the operation and management of the RICO Enterprise and did not act merely as an outside referral source.

49.     During the first solicitation for tax year 2017 and thereafter, Defendant Hill and, Mr. James Comerford ("Mr. Comerford"), Mr. Sean O'Toole ("Mr. O'Toole") Mr. Jack Fisher ("Mr. Fisher") individually made representations of fact to Plaintiffs regarding the legitimacy, lawfulness, tax benefits, and defensibility of the Fraudulent CE scheme via phone, text message, and email between December 19, 2017 and December 26, 2017.

50.     Defendant represented that Plaintiffs could reduce their personal tax liability through the Fraudulent CE Scheme via text message, phone call, and email from December 19, 2017 through December 26, 2017.

51.     Defendant represented via phone, text message, and email between December 19, 2017 and December 26, 2017, that the marketing and sales documents provided to Plaintiffs were legitimate real estate investment plans and that the terms complied with applicable laws governing syndicated conservation easement deductions.

52.     Defendant represented via phone, text message, and email between December 19, 2017 and December 26, 2017, that the offering documents included multiple legitimate and economically viable development options for the properties, thereby portraying the investments as bona fide real estate ventures.

53.    In reality, those purported options were sham alternatives that were neither feasible nor intended to be pursued and were included solely to create the appearance of economic substance while the true purpose of the transactions was to implement an illegal and abusive tax shelter scheme.

54.    Defendant marketed the syndicated conservation easement transactions to Plaintiffs after the IRS had issued IRS Notice 2017-10 on December 23, 2016, and after it became official published guidance in the Internal Revenue Bulletin on January 17, 2017.

55.    Defendant had actual knowledge of IRS Notice 2017-10 between December 19, 2017 and December 26, 2017, or should have known of it, because he was involved in the promotion, management, or implementation of the entities involved in the syndicated conservation easement transactions, and received commissions from the Enterprise marketed by Defendant.

56.    To induce Plaintiffs to invest, the Defendant marketed the transactions as legitimate real estate investments with documents describing multiple viable development pathways for the properties.

57.    The offering materials supplied by Defendant affirmatively represented that the entities that formed the basis of the RICO Enterprise had legitimate, independent, and economically viable options for the properties and that

14

management would evaluate and pursue one or more options based on market conditions and profitability.

58.     For example, the 1908RGC17 Feeder Fund Summary represented that investors would have three immediate options: develop the property for mining or residential/commercial purposes, hold the property for future use and speculation, or make a charitable donation of the property.

59.     The Rivershore Sand Investors summary represented that the company's stated primary business purpose was to acquire an ownership interest in property containing mineable land in Hancock County, Mississippi.

60.     The Rivershore Sand Investors summary further represented that the property was ideal for development of a mining facility producing sand proppant for hydraulic fracturing operations.

61.     The Rivershore Sand Investors summary represented that investors had three options: mine the property immediately, hold the property and speculate on a recovering energy exploration market, or make a charitable donation of the property.

62.     The Coastal Community Partners summary represented that Coastal Community Partners owned approximately 1,292 acres of the New Hampstead Planned Unit Development and 2,500 units of density, which it planned to develop.

63.     The Coastal Community Partners summary represented that investors had three immediate options: develop a master-planned mixed-use, multi-neighborhood residential community with a resort, retail, and commercial village component; hold the property for future use and speculation; or make a charitable donation of the property to the North American Land Trust.

64.     Those representations were material because the existence of viable options conveyed that the investments had economic substance, a genuine profit motive, and business purpose independent of tax benefits.

65.     In truth, the options were sham alternatives. They were not viable, were not realistically achievable for the properties, and were not intended to be pursued.

66.     Among other things, the options lacked one or more of the following: zoning or entitlement feasibility, infrastructure or access feasibility, credible financing or capitalization plans, realistic market demand analysis, operational planning and permitting, bona fide negotiations with third parties, and management intent to execute the most viable options.

67.     The Defendant along with other individuals and entities that comprised the RICO Enterprise included the options in the offering materials primarily to make the investments appear legitimate and to disguise the transactions' true purpose: generating tax deductions through syndicated conservation easement structures.

68.     The Defendant along with other individuals and entities that comprised the RICO Enterprise knew, or were willfully blind to the fact, that the options described in the offering materials were not viable and that they were being presented to support a false narrative of economic substance.

69.     The offering was structured so that, regardless of any purported business plan, the Defendant along with other individuals and entities that comprised the RICO Enterprise would proceed to the conservation easement deduction option and claim tax benefits at ratios and valuations that were not supported by the properties' real economics.

70.     Defendant further reinforced the illusion of legitimacy by circulating curated projections, selective comparables, appraisal materials, and development materials, all while enjoying the benefits of a pre-existing trusted working relationship with Plaintiffs employer while omitting or downplaying facts demonstrating that the options were impracticable or uneconomic.

## C. **Defendant and the other RICO Enterprise individuals and entities Implemented, Managed, and Concealed the Same Scheme**

71.     Defendant, along with the other RICO Enterprise individuals and entities likewise marketed, managed, implemented, and concealed the same syndicated conservation easement scheme.

72.     Coastal Community Partners, LLC, Inland Capital Management LLC, and 1908 Capital CCP LLC made representations of fact to Plaintiffs concerning the legality, legitimacy, valuation, economic substance, and defensibility of the syndicated conservation easement transactions.

73.     Defendant, along with the other RICO Enterprise individuals and entities represented that Plaintiffs could reduce their personal tax liability through lawful real estate investments.

74.     Defendant, along with the other RICO Enterprise individuals and entities represented that the marketing and sales documents provided to Plaintiffs were legitimate real estate investment plans and complied with applicable laws governing syndicated conservation easement deductions.

75.     Defendant, along with the other RICO Enterprise individuals and entities represented that the Fraudulent CE Scheme had legitimate and economically viable development options for the properties.

76.     Coastal Community Partners materials represented that Inland Capital Management LLC formed Coastal Community Partners to acquire parcels of developable real estate meeting strict investment criteria.

77. The Coastal Community Partners materials represented that 1908 Capital CCP LLC was both an owner and manager of the Coastal Community Partners offering.

78. The Coastal Community Partners materials represented that the property had development value, existing density, and infrastructure, including water, roads, and sewer infrastructure.

79. The Coastal Community Partners PPM and Inland Capital 2017 New Hampstead Presentation further portrayed Coastal Community Partners and the New Hampstead transaction as involving development, management expertise, conservation, buy-and-hold strategies, and a bona fide real estate development opportunity.

80. In reality, those options were sham alternatives that were neither feasible nor intended to be pursued and were included solely to create the appearance of economic substance.

81. Defendant, along with the other RICO Enterprise individuals and entities marketed and implemented the transactions after IRS Notice 2017-10 had been issued and published.

82. Defendant, along with the other RICO Enterprise individuals and entities had actual knowledge of IRS Notice 2017-10, or should have known of it,

because they directly managed, implemented, and/or controlled the entity involved in the Coastal Community Partners transaction.

83. Defendant, along with the other RICO Enterprise individuals and entities further reinforced the illusion of legitimacy by circulating projections, comparables, appraisal materials, valuation summaries, subscription documents, and tax-related documents, while omitting or downplaying facts demonstrating that the purported business options were impracticable or uneconomic.

84. Defendant, along with the other RICO Enterprise individuals and entities continued to conceal material facts concerning valuation methodology, compliance deficiencies, and internal communications regarding risk.

85. Defendant, along with the other RICO Enterprise individuals and entities provided reassurances designed to deter inquiry and discourage independent investigation between December 19, 2017 and December 26, 2017.

86. Defendant, along with the other RICO Enterprise individuals and entities, claimed that each entity had a "war chest" of $1,000,000.00 to dispute and pay any future IRS penalties and fines.

87. Plaintiffs relied on the statements of the Defendant and the other individuals and entities consisting of the RICO Enterprise.

88.    Defendant actively concealed the legality of the Fraudulent Tax Scheme until Plaintiffs' discovery that most of the claimed prior deductions were disallowed by the IRS.

89.    This concealment delayed and deterred Plaintiffs from discovering the true nature of the transactions and bringing claims earlier.

90.    Plaintiffs first learned that the Fraudulent CE Scheme was illegal and their prior charitable deductions would be largely disallowed by the IRS in January of 2026.

91.    Plaintiff Curry has suffered damages totaling not less than $387,075.00 as a direct result of relying on Defendant's fraudulent statements regarding the legality of the Fraudulent CE Scheme.

92.    Plaintiff McFarland has suffered damages totaling not less than $3,102,076.00 as a direct result of relying on Defendant's fraudulent statements regarding the legality of the Fraudulent CE Scheme.

## D. **Plaintiffs' suffered financial injury due to Defendant's fraudulent representations.**

93.    Defendant's own documents show that the tax benefits were extraordinary compared to the invested amounts.

21

94. The 1908RGC17 Feeder Fund Summary, emailed to both Plaintiffs, represented that each $100,000 invested would result in approximately $530,000 in federal tax deductions.

95. The Rivershore Sand Investors summary emailed to both Plaintiffs, represented that a charitable donation of the property could qualify for a charitable income tax deduction of approximately $600,000 for each $100,000 invested.

96. The Coastal Community Partners summary, emailed to both Plaintiffs, represented that the charitable donation option could qualify for a $96,000,000 deduction and was estimated to result in a 4.40:1 federal tax deduction.

97. The Coastal Community appraisal summary, emailed to both Plaintiffs, valued the conservation easement contribution at approximately $96,810,000.

98. These deduction multiples were far above the 250 percent threshold identified in IRS Notice 2017-10.

99. The Rivershore Form 8886 identified the Rivershore transaction as a listed transaction and referenced IRS Notice 2017-10.

100. The Bayou Sand Form 8886 similarly identified a syndicated conservation easement transaction as a listed transaction and referenced IRS Notice 2017-10.

101.   These documents confirm that Defendant knew, or should have known, that the transactions fell within the exact category of transactions the IRS had identified for heightened scrutiny.

102.   Despite this, Defendant continued to market and sell the transactions to Plaintiffs as legitimate, defensible, and compliant, while Defendant withheld that he would receive commissions after Plaintiffs' invested in the RICO Enterprise entities that Defendant was working for.

103.   Defendant and the other RICO Enterprise individuals and entities failed to disclose the true level of risk created by the deduction multiples, the IRS's position, and the likelihood that the deductions would be challenged or disallowed.

104.   Defendant and the other RICO Enterprise individuals and entities also failed to disclose that the valuation assumptions and development alternatives were designed to support predetermined deduction outcomes rather than reflect legitimate fair market value.

105.   Plaintiff Curry has suffered damages totaling not less than $387,075.00 as a direct result of relying on Defendant's fraudulent statements regarding the legality of the Fraudulent CE Scheme.

106. Plaintiff McFarland has suffered damages totaling not less than $3,102,076.00 as a direct result of relying on Defendant's fraudulent statements regarding the legality of the Fraudulent CE Scheme.

### E. Plaintiffs Invested in Reliance on Defendant's Representations

107. Plaintiffs were introduced to Mr. Fisher, Mr. Hill, and Mr. Comerford through Defendant.

108. Defendant, and the other RICO Enterprise individuals and entities solicited Plaintiffs based on their claimed experience, expertise, and ability to structure tax-advantaged real estate investments.

109. Plaintiffs relied on Defendant's and the other RICO Enterprise individuals' and entities' representations that the investments were legitimate and that the conservation easement deductions were lawful and defensible.

110. Plaintiffs executed subscription documents and invested substantial funds in the Fraudulent CE Scheme marketed by Defendant, and the other RICO Enterprise individuals and entities.

111. But for Defendant's misrepresentations and omissions, Plaintiffs would not have invested in the transactions.

112. Plaintiffs would not have invested had they known that the development, mining, and holding options were not viable, that the conservation

outcome was effectively predetermined, that the deduction amounts were inflated, and that the transactions fell within the category of transactions already targeted by the IRS, and that Defendant was receiving commissions if Plaintiffs' invested in the Fraudulent CE Scheme.

### F. IRS Materials and Later Proceedings Confirmed the Risk Defendant Concealed

113. After Plaintiffs invested and claimed the deductions in 2017, IRS reporting materials and later proceedings confirmed the very risks Defendant knew about, but failed to disclose.

114. Plaintiffs' damages arise specifically from the disallowance of certain charitable deductions claimed for the 2017 tax year arising from the Fraudulent CE Scheme.

115. Plaintiffs have been damaged and continue to be damaged by Defendant's actionable omissions and active misconduct, including the money lost in the transactions, IRS penalties, interest accrued on taxes from the date due, professional fees, and ongoing interest accruing on tax liability and penalties.

116. The Defendant's concealment delayed the Plaintiffs' ability to discover the true nature of the transactions.

117. Plaintiffs did not know, and could not reasonably have known, that Defendant's representations were false until IRS proceedings, tax reporting materials, and later developments revealed that the transactions were being treated as abusive or noncompliant syndicated conservation easement transactions.

118. Prior to that time, Defendant and the other RICO Enterprise individuals and entities continued to advise Plaintiffs that the charitable contribution deductions generated by the transactions complied with all applicable tax laws and regulations and would be accepted by the IRS.

119. In making these representations and providing this advice, Defendant, and the other RICO Enterprise individuals and entities, made false representations and concealed material facts relating to their own wrongdoing and the numerous flawed aspects of the transactions.

120. In reliance on these representations and advice, Plaintiffs were delayed and deterred from bringing claims against Defendant.

121. One specific omission used to deter and debar Plaintiff from understanding the true nature of his investments was Defendant, and the other RICO Enterprise individuals and entities, failure to warn or advise Plaintiff to make tax deposits to stop the accrual of interest on overdue tax and penalties.

26

### G. Plaintiffs Suffered Substantial Damages

122.  As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered substantial financial damages.

123.  Plaintiffs' damages include investment losses, tax liabilities, penalties, interest, attorneys' fees, accounting fees, and other professional expenses incurred to respond to IRS proceedings and correct the consequences of Defendants' scheme.

124.  Plaintiff Curry's damages are not less than $387,075.00.

125.  Plaintiff McFarland's damages are not less than $3,102,076.00.

126.  Plaintiffs' damages were caused by the Defendant's false representations, omissions, concealment, and coordinated use of the Fraudulent CE Scheme.

### H. Defendant Acted Jointly and in Concert as a RICO Enterprise

127.  Defendant did not act independently or by accident.

128.  Defendant, and the other RICO Enterprise individuals and entities ,solicited Plaintiff and represented that the Fraudulent CE Scheme was legitimate and lawful.

129.  Defendant and the other RICO Enterprise individuals and entities, prepared, approved, circulated, managed, and implemented the offering materials,

27

subscription materials, investor summaries, tax matrices, appraisal summaries, Form 8886 materials, and related transaction documents.

130. Defendant and the other RICO Enterprise individuals and entities accepted investor funds and participated in the donation and tax reporting process.

131. The same general structure was repeated across multiple investment entities, including 1908RGC17 LLC, Rivershore Sand Investors LLC, Coastal Community Partners LLC, and related conservation easement structures.

132. Defendant and the other RICO Enterprise individuals and entities used overlapping participants, similar documents, similar deduction structures, and similar investor communications.

133. Defendant's and the other RICO Enterprise individuals' and entities' scheme was carried out through interstate email, telephone communications, wire transfers, offering documents, subscription documents, investor updates, tax reporting documents, private carriers, and mail.

134. Defendant and the other RICO Enterprise individuals and entities' conduct formed a pattern of racketeering activity because it involved repeated fraudulent communications and document transmissions used to solicit investments, obtain investor funds, implement the transactions, report inflated deductions, and conceal the true nature of the scheme.

135. Plaintiffs were injured in their business and property by reason of Defendant's conduct.

136. The Defendant's conduct was knowing, intentional, willful, wanton, and in conscious disregard of Plaintiffs rights, and the tax consequences of Plaintiffs' investments.

### III. CAUSES OF ACTION

### COUNT I – FRAUD / FRAUDULENT INDUCEMENT

137. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

138. At all relevant times, Defendant jointly and in concert with others devised, implemented, promoted, and executed a scheme to defraud Plaintiffs and similarly situated investors.

139. As part of that scheme, Defendant made material misrepresentations and omissions of fact to Plaintiffs between December 19, 2017 and December 26, 2017, both directly and through written and electronic communications, including but not limited to the Investment Memorandum of 1908RGC17 LLC, the 1908RGC17 Feeder Fund Summary, Plaintiff's Subscription Agreement, the Rivershore Sand Investors summary, the Coastal Community Partners summary, the Coastal Community Partners PPM, the Inland Capital New Hampstead presentation, appraisal materials, and tax reporting documents.

140. Defendant's misrepresentations included, without limitation, the following:

141. That the syndicated conservation easement transactions were legitimate, lawful real estate investments;

    a. That the properties underlying the investments had multiple independent, viable, and economically feasible development options;

    b. That the conservation easement path was merely one of several legitimate business alternatives;

    c. That the valuation supporting the conservation easement deductions was credible, independent, and compliant with applicable appraisal standards;

    d. That the transactions complied with longstanding statutory, regulatory, and substantiation requirements governing conservation easement deductions;

    e. That the transactions were defensible and carried low or manageable audit risk;

    f. That Defendant's financial interests, compensation structures, and conflicts did not affect the integrity of the transactions.

142. Each of the foregoing representations was false when made.

143. Defendant knew or were willfully blind to:

a. The transactions were structured as abusive tax shelter schemes designed to generate predetermined and inflated tax deductions;

b. The purported development options were sham alternatives that were not viable, not economically feasible, and not intended to be pursued;

c. The valuation methodology was designed to reach a target deduction multiple rather than reflect fair market value;

d. The transactions failed to comply with longstanding conservation easement requirements, including proper valuation, substantiation, and economic substance principles;

e. Defendant had undisclosed financial incentives, compensation arrangements, and conflicts tied to the size of the deductions generated;

f. Defendant knew or should have known that IRS Notice 2017-10 identified certain syndicated conservation easement transactions as listed transactions, including transactions where the potential charitable contribution deduction equaled or exceeded 250 percent of the amount invested;

g. The deduction multiples promoted to Plaintiffs far exceeded that threshold, including the 1908RGC17 projected deduction of

approximately $530,000 for each $100,000 invested, the Rivershore projected deduction of approximately $600,000 for each $100,000 invested, and Coastal Community's projected 4.40:1 deduction multiple.

144.   Defendant and the other RICO Enterprise individuals and entities made these representations intentionally, knowingly, or with reckless disregard for the truth.

145.   Defendant made these representations for the purpose of inducing Plaintiffs to invest in the transactions, contribute capital, and claim the resulting tax deductions.

146.   Plaintiffs reasonably relied upon Defendant's representations and omissions, including their claimed expertise, experience, and control over the transactions.

147.   Defendant further concealed material facts and continued to provide reassurances after Plaintiffs' investment in order to prevent discovery of the fraud.

148.   As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs suffered damages, including but not limited to:

- Loss of investment capital;

- IRS and/or state tax liabilities;

- Interest and penalties;

- Professional fees, including legal and accounting costs;

- Costs incurred to correct and respond to the consequences of the transactions.

149. Defendant's fraudulent concealment tolls any applicable statute of limitations.

## COUNT II – NEGLIGENT MISREPRESENTATION

150. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

151. In the alternative to Count I, Defendant, in the course of their business, profession, employment, and pecuniary interests, supplied false information to Plaintiffs concerning the 1908RGC17, Rivershore, and Coastal Community syndicated conservation easement transactions.

152. Defendant supplied false information by representing that the transactions were legitimate real estate investments with lawful, compliant, and economically substantive business purposes.

153. Defendant supplied false information by representing that the properties had bona fide non-tax alternatives, including mining, development, holding, conservation, and charitable donation.

154. Defendant supplied false information by representing that the conservation easement deductions were supported by reliable valuation materials, reasonable appraisal assumptions, and proper tax compliance.

155. Defendant failed to exercise reasonable care and competence in obtaining, reviewing, verifying, and communicating such information to Plaintiffs.

156. Specifically, Defendant:

    a. Provided materially inflated valuation figures without reasonable verification;

    b. Represented compliance with conservation easement requirements without ensuring that the transactions satisfied applicable valuation, substantiation, qualified appraisal, and economic substance requirements;

    c. Represented that the purported non-tax alternatives were viable without reasonably verifying whether those alternatives were economically feasible or actually intended to be pursued;

d. Failed to disclose material conflicts, financial incentives, referral relationships, compensation structures, and self-interested motives tied to the size of the deductions generated;

e. Misrepresented or failed to adequately assess audit risk and regulatory scrutiny, including the risk created by IRS Notice 2017-10;

f. Failed to disclose that the deduction multiples promoted to Plaintiff far exceeded the 250 percent threshold identified in IRS Notice 2017-10;

g. Defendant failed to warn or advise Plaintiffs to make tax deposits to stop the accrual of interest on overdue tax and penalties.

157. Defendant knew or should have known that Plaintiff would rely on these representations and omissions in deciding whether to invest, execute subscription documents, contribute capital, and claim the resulting tax deductions.

158. Plaintiffs reasonably relied upon Defendant's representations and omissions because Defendant held themself out as having superior knowledge, experience, was a former senator in the United States Senate and control over the investment entities, transaction structure, valuation materials, and tax-related documentation.

159. Plaintiffs would not have invested had they known that the purported non-tax alternatives were not bona fide, that the conservation outcome was

35

effectively predetermined, that the valuation assumptions were unreliable, that the deduction multiples triggered heightened IRS scrutiny, and that Defendant had failed to disclose material risks and conflicts.

160. As a direct and proximate result of Defendant's negligent misrepresentations, Plaintiffs suffered substantial financial damages, including investment losses, IRS and/or state tax liabilities, penalties, interest, legal fees, accounting fees, professional fees, and costs incurred to correct and respond to the consequences of the transactions.

## COUNT III – GEORGIA RICO (O.C.G.A. § 16-14-4)

161. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

162. Defendant and the other RICO Enterprise individuals and entities', formed an enterprise within the meaning of O.C.G.A. § 16-14-3.

163. The enterprise consisted of promoters, managers, investment entities, affiliated professionals, referral sources, and related participants who functioned as a continuing unit for the common purpose of marketing, selling, managing,

implementing, and concealing fraudulent syndicated conservation easement transactions.

164. Defendant and the other RICO Enterprise individuals and entities', jointly and in concert, engaged in a pattern of racketeering activity through repeated acts between December 19, 2017 and December 26, 2017 designed to induce Plaintiffs and similarly situated investors to invest in abusive syndicated conservation easement transactions.

165. The racketeering activity included, but is not limited to:

a. Theft by deception;

b. False statements and writings;

c. Use of interstate wires and mails to execute the scheme;

d. Transmission of misleading offering materials, investor summaries, subscription documents, tax matrices, valuation materials, appraisal materials, Form 8886 materials, and investor communications;

e. Collection of investor funds under false pretenses;

f. Coordination of tax reporting documents reflecting inflated deductions; and

37

g. Ongoing communications designed to maintain investor participation, suppress inquiry, defend the transactions, and conceal the scheme after Plaintiff invested.

166.   These acts were continuous and formed a pattern, not isolated events.

167.   Defendant's racketeering activity directly and proximately caused injury to Plaintiff's business and property.

168.   Plaintiffs are entitled to treble damages, attorneys' fees, and all remedies available under O.C.G.A. § 16-14-6.

## COUNT IV – FEDERAL RICO (18 U.S.C. § 1962(c))

169.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

170.   Defendant conducted and participated, directly and indirectly, in the affairs of an enterprise through a pattern of racketeering activity.

171.   The enterprise was an association-in-fact consisting of Defendant and their co-conspirators, including promoters, managers, investment entities, affiliated professionals, appraisers, referral sources, and other participants involved in marketing, selling, managing, implementing, and concealing the syndicated conservation easement transactions.

38

172. The enterprise had a common purpose: to solicit investor funds and generate fees by promoting abusive syndicated conservation easement transactions as lawful, compliant, economically substantive, and defensible real estate investments.

173. The enterprise had relationships among its participants, including the Defendant who solicited Plaintiffs, the Manager and Entity Defendants who controlled and implemented the transactions, the entity defendants that accepted investor funds, and other professionals and participants who supplied or helped circulate transaction documents, valuation materials, appraisal materials, tax memoranda, and investor communications.

174. The enterprise had sufficient longevity to pursue its purpose because the same general structure was repeated across multiple syndicated conservation easement transactions, including the 1908RGC17, Rivershore, and Coastal Community transactions.

175. The enterprise affected interstate commerce by using interstate emails, telephone communications, U.S. Mail, private carriers, wire transfers, banking channels, subscription documents, investor summaries, tax matrices, valuation materials, appraisal materials, investor portal materials, and investor correspondence

to solicit investments, transmit documents, receive funds, and implement the transactions.

176. Defendant and the other RICO Enterprise individuals and entities' predicate acts include multiple violations of

- 18 U.S.C. § 1341 (Mail Fraud);

- 18 U.S.C. § 1343 (Wire Fraud).

177. Defendant and the other RICO Enterprise individuals and entities' used interstate communications, including email, telephone, and mail, to:

a. Solicit Plaintiffs' investments;

b. Transmit false and misleading investor summaries, tax matrices, offering materials, subscription documents, valuation materials, highest-and-best-use materials, tax memoranda, investor letters, emails, and other correspondence;

c. Represent that the transactions were lawful, compliant, economically substantive, and supported by bona fide non-tax alternatives;

d. Accept and process Plaintiffs' investment funds through subscription documents, investment entities, wire transfers, checks, banking channels, or other payment methods;

e. Fail to disclose that the promoted deduction multiples far exceeded the 250 percent threshold identified in IRS Notice 2017-10;

f. Fail to disclose material conflicts, financial incentives, referral relationships, compensation structures, and self-interested motives tied to the size of the deductions generated; and

g. Conceal the true nature of the transactions after Plaintiffs invested by continuing to characterize the transactions as legitimate, compliant, economically substantive, and defensible.

178. Defendant's and the other RICO Enterprise individuals' and entities' actions were part of a coordinated scheme to defraud investors and enrich themselves.

179. The predicate acts were related and continuous.

180. Plaintiffs were injured in their business and property by reason of Defendant's RICO violations.

181. Plaintiffs are entitled to treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c).

**COUNT V – VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT (O.C.G.A. § 10-1-390 et seq.)**

182. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

183. The Georgia Fair Business Practices Act of 1975, O.C.G.A. § 10-1-390 et seq. (the "FBPA"), declares unlawful all unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce. O.C.G.A. § 10-1-393(a).

184. At all relevant times, Defendant, jointly and in concert with the Promoters and the Managers and Managing Entities, was engaged in trade or commerce within the meaning of the FBPA by advertising, marketing, offering, promoting, soliciting, and selling ownership interests in the partnerships and limited liability companies that comprised the Fraudulent CE Scheme, including 1908RGC17 LLC, Illuminate Resources Group LLC, Coastal Property Holdings LLC, Bayou Sand Investors LLC, and Coastal Community Partners LLC.

185. Defendant marketed and sold these ownership interests as a packaged, mass-marketed consumer product—a tax-mitigation investment promoted through standardized offering memoranda, feeder fund summaries, investor portal materials, tax matrices, and solicitations distributed to Plaintiffs and a broad network of other prospective purchasers. Defendant's promotional conduct was public, repetitive, and

42

impersonal, and was directed at the consuming public within the consumer marketplace rather than to Plaintiffs alone.

186.   In marketing and selling the ownership interests, Defendant represented that the product possessed qualities, characteristics, uses, and benefits that it did not have. In particular, Defendant represented that each dollar used to purchase an ownership interest would generate substantially more than a one-to-one federal income tax deduction, and that the product was a legal, legitimate, compliant, and defensible tax-mitigation strategy.

187.   Defendant's own marketing materials quantified the promised deduction multiples: the 1908RGC17 Feeder Fund Summary represented approximately $530,000 in federal tax deductions for each $100,000 invested; the Rivershore Sand Investors summary represented a charitable income tax deduction of approximately $600,000 for each $100,000 invested; and the Coastal Community Partners summary represented a deduction multiple of approximately 4.40 to 1. Each of these representations promised far more than a one-to-one tax deduction for every dollar used to purchase an ownership interest.

188.   The foregoing representations were unfair and deceptive acts and practices in the conduct of consumer transactions and consumer acts or practices in

trade or commerce, prohibited by O.C.G.A. § 10-1-393(a) and (b), including without limitation the following:

    a. Representing that goods or services have sponsorship, approval, characteristics, uses, or benefits that they do not have, in violation of O.C.G.A. § 10-1-393(b)(5);

    b. Representing that goods or services are of a particular standard, quality, or grade when they are of another, in violation of O.C.G.A. § 10-1-393(b)(7);

    c. Advertising goods or services with intent not to sell them as advertised, in violation of O.C.G.A. § 10-1-393(b)(9); and

    d. Engaging in other unfair and deceptive acts and practices in the conduct of consumer transactions and consumer acts in trade or commerce, in violation of O.C.G.A. § 10-1-393(a).

189.  Each of these representations was false. In truth, the product was not a lawful tax-mitigation strategy but an illegal and abusive syndicated conservation easement tax shelter. A dollar used to purchase an ownership interest could not lawfully generate more than a one-to-one deduction, much less the inflated multiples Defendant promoted. The promised deductions were grossly overstated, were unsupported by credible valuation or qualified appraisals, and fell squarely within

the category of listed transactions the IRS had identified for disallowance in IRS Notice 2017-10, which identified syndicated conservation easement transactions yielding deductions of 250 percent or more of the amount invested.

190.  Defendant's deceptive representations were not isolated or unique to Plaintiffs. They were made through standardized marketing and offering materials by a network of purported experts—including Defendant, the Promoters, and the Managers and Managing Entities—who worked in concert to fool Plaintiffs and other members of the consuming public into believing that an illegal tax shelter was a legal tax-mitigation product.

191.  Defendant's conduct had, and was intended to have, an impact on the consumer marketplace because the same product, materials, and misrepresentations were marketed and sold to numerous prospective purchasers through the same promoter network using the same standardized scheme.

192.  The unfair and deceptive acts and practices were material and were intended to, and did, induce Plaintiffs to purchase ownership interests in the Fraudulent CE Scheme in reliance thereon. Plaintiffs are natural persons who reasonably relied on Defendant's representations and who would not have purchased the ownership interests but for those representations.

193.   As a direct and proximate result of Defendant's violations of the FBPA, Plaintiffs suffered actual injury and damages, including the loss of the capital used to purchase the ownership interests; IRS and state tax liabilities, assessments, penalties, and interest; professional fees, including legal and accounting costs; and other costs incurred to respond to and correct the consequences of the transactions. Plaintiff Curry's damages are not less than $387,075.00, and Plaintiff McFarland's damages are not less than $3,102,076.00.

194.   Defendant's violations of the FBPA were intentional, knowing, and willful. Accordingly, Plaintiffs are entitled to recover exemplary damages in the amount of three times their actual damages pursuant to O.C.G.A. § 10-1-399(c), together with their reasonable attorneys' fees and expenses of litigation pursuant to O.C.G.A. § 10-1-399(d).

195.   Prior to asserting this claim, Plaintiffs delivered to Defendant a written demand for relief identifying the claimants and reasonably describing the unfair and deceptive acts and practices and the injury suffered, in satisfaction of the notice requirement of O.C.G.A. § 10-1-399(b), and Defendant failed to tender a reasonable correction, repair, replacement, or other remedy within 30 days. Defendant's fraudulent concealment further tolls any applicable limitation period.

**COUNT VI – ATTORNEYS' FEES (O.C.G.A. § 13-6-11)**

46

196.  Plaintiffs reallege all preceding paragraphs.

197.  Defendant has acted in bad faith in the underlying transaction.

198.  Defendant has been stubbornly litigious.

199.  Defendant has caused Plaintiffs unnecessary trouble and expense.

200.  Defendant's bad faith includes:

   a.  Knowingly promoting and implementing abusive tax shelter transactions;

   b.  Concealing material facts and risks;

   c.  Failing to disclose conflicts and financial incentives;

   d.  Continuing to mislead Plaintiffs after investment;

   e.  Forcing Plaintiffs to incur significant legal and professional expenses.

201.  Plaintiffs are entitled to recover attorneys' fees and litigation expenses.

## COUNT VII – PUNITIVE DAMAGES

202.  Plaintiffs reallege all preceding paragraphs.

203.  Defendant's conduct was willful, wanton, malicious, and in conscious disregard of the consequences of the Fraudulent CE Scheme to Plaintiffs in the form of disallowed charitable deduction, taxes, penalties, and interest from the IRS.

47

204.  Defendant knowingly engaged in a fraudulent scheme for financial gain.

205.  Punitive damages are necessary to punish and deter Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant as follows:

   a.  Trial by jury on all issues so triable;

   b.  Judgment against Defendant on all counts;

   c.  Compensatory damages in an amount to be proven at trial;

   d.  Treble damages under Georgia RICO and federal RICO as allowed by law;

   e.  Exemplary damages in the amount of three times Plaintiffs' actual damages for Defendant's intentional violations of the Georgia Fair Business Practices Act pursuant to O.C.G.A. § 10-1-399(c);

   f.  Punitive damages in an amount sufficient to punish and deter Defendant;

   g.  Reasonable attorneys' fees, costs, and expenses of litigation pursuant to O.C.G.A. § 13-6-11, O.C.G.A. § 16-14-6, O.C.G.A. § 10-1-399(d), 18 U.S.C. § 1964(c), and any other applicable law;

> h.  Pre-judgment and post-judgment interest as allowed by law; and
>
> i.  Such other and further relief as this Court deems just and proper.

Respectfully submitted,

   **This** 28th day of July, 2026.

Respectfully submitted,

**WEENER NATHAN PHILLIPS, LLP**

/s/ Renée A. Morgan

Renée A. Morgan
Georgia Bar No.: 193064
*Attorney for Plaintiffs*

5887 Glenridge Drive, NE, Suite 275
Atlanta, GA  30328
Tel. (770) 392-9004
Fax (770)522-9004
Emails:  rmorgan@wnpllp.com

## <u>CERTIFICATE OF SERVICE AND TYPE SIZE COMPLIANCE</u>

Pursuant to Local Rule 5.1C, ND Ga. and Standing Order No. 04-01, the foregoing pleading is prepared in Times New Roman, 14 point, and was filed using the CM/ECF system.

**This** 28th day of July, 2026.

/s/ *Renée A. Morgan__*
Renée A. Morgan
Georgia Bar No.: 193064

50